IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

TIMOTHY D. POPE,                      )
                                      )
        Plaintiff,                    )
                                      )
v.                                    )        Civil Action No. 2:03cv199-ID
                                      )
STATE OF ALABAMA, et al.,             )
                                      )
        Defendants.                   )

## MEMORANDUM OPINION AND ORDER

### I.  INTRODUCTION

This cause is before the court on a motion for summary judgment, filed by the

State of Alabama, the Alabama Department of Corrections ("ADOC"), the Alabama State

Personnel Department ("ASPD"), ASPD's director, and ADOC's commissioner

(collectively, "State Defendants").  (State Defs. Mot. (Doc. No. 51)); (see also Order

(Doc. No. 54) (construing motion to dismiss as one for summary judgment).)  The motion

is accompanied by a memorandum of law.  (State Defs. Mem. of Law (Doc. No. 52).)

The State Defendants move for summary judgment on the claims brought by Plaintiff

Timothy Pope ("Pope") alleging that he was denied a promotion based upon his race

(Caucasian) through the application of a 1970 court-ordered race-conscious remedy,

referred to as the no-bypass rule, which was designed to combat racial bias against

African-Americans in the State of Alabama's employment practices.  Pope brings his

claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to

2000e-17 ("Title VII"), and the Equal Protection Clause of the Fourteenth Amendment to

the United States Constitution, as enforced by 42 U.S.C. § 1983 ("§ 1983").  Opposing

summary judgment, Pope filed a response to which the State Defendants filed a reply.

(Pl. Resp. (Doc. No. 56)); (State Defs. Reply (Doc. No. 57).)  Because there are no

disputed issues of material fact, and after careful consideration of the arguments of

counsel, the relevant law and the record as a whole, the court finds that the State

Defendants' motion for summary judgment is due to be granted.


## II.  JURISDICTION AND VENUE

The court exercises subject matter jurisdiction over this action, pursuant to 28

U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343(a)(3) (civil rights

jurisdiction).  The parties do not contest personal jurisdiction or venue, and the court

finds adequate allegations of each.


## III.  STANDARD OF REVIEW

A court considering a motion for summary judgment must construe the evidence

and make factual inferences in the light most favorable to the nonmoving party.  See

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Adickes v. S. H. Kress & Co., 398

U.S. 144, 157 (1970).  At the summary judgment juncture, the court does not "weigh the

evidence and determine the truth of the matter," but solely "determine[s] whether there is

a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)

(citations omitted).

Summary judgment is entered only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing that there is no dispute of material fact or by showing that the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Id. at 322-23, 325. The burden then shifts to the nonmoving party, which "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Summary judgment will not be entered unless the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. See id. at 587.

## IV.  BACKGROUND

Pope, a Caucasian male, was denied a promotion with the ADOC based upon the application of a court-mandated remedy. The no-bypass rule, as the remedy has come to be called, was the product of an injunction entered in 1970 in a case tried in this district

3

and originally styled <u>United States v. Frazer</u>, No. 2:68cv2709 (hereafter "<u>Frazer</u>").[1]  In

<u>Frazer</u>, after a trial on the merits, the court found the ASPD and the heads of seven

Alabama agencies liable for engaging in a pattern or practice of discriminating against

African-Americans through hiring and promotional practices.  In an effort to remedy the

illegal discrimination, the late Honorable Frank M. Johnson, Jr., who presided over the

trial, entered injunctive orders, one of which implemented the no-bypass rule.  As

recognized by the Honorable Myron H. Thompson, who later inherited the case, "the no-

bypass rule was 'imposed in response to evidence that, up until 1970, the State of

Alabama was unabashedly refusing to hire and promote African-Americans to almost any

and all non-menial positions in state government because of their race'" and "was part of

an extensive remedial order to redress this discrimination."  <u>Frazer</u>, 2:68cv2709, Op. at 3

(Doc. No. 779) (citation omitted).  Distilled to its essence, the no-bypass rule prohibited

Alabama state officials from bypassing a higher-ranked African-American applicant in

favor of a lower-ranked Caucasian applicant on a certificate of eligibles "unless the

defendants determine[d] that the [African-American] applicant [was] not qualified to

perform the duties of the position, or [was] otherwise not fit for the position."  <u>U.S. v.</u>

<u>Frazer</u>, 317 F. Supp. 1079, 1091 (M.D. Ala. 1970); <u>see also</u> <u>Frazer</u>, 2:68cv2709 (M.D.

Ala. June 30, 2006) (Op. at 2, Doc. No. 779, discussing the no-bypass rule).

---

[1] The lawsuit's case name now is styled differently, but for continuity, herein, the
court refers to the lawsuit as it was known at its commencement.

4

In 1976, the Frazer court extended application of the injunctive orders to all but one Alabama agency.  The ADOC was among the state entities which was required to adhere to the no-bypass rule.  See U.S. v. Frazer, No. 2:68cv2709-N, 1976 WL 729, *1 (M.D. Ala. 1976) ("There is no question from the evidence in this case that systematic discrimination against black citizens of Alabama has been as extensive among the new defendants as it had been among the original defendants.").  The Frazer no-bypass rule remained in effect until its temporary suspension in May 2005 which was followed by its permanent termination in June 2006.  Frazer, 2:68cv2709 (Orders, Doc. Nos. 735 & 779).

 It is undisputed that Pope was directly and adversely affected by the State Defendants' application of the no-bypass rule.  In September 2002, having been interviewed, Pope orally was offered a promotion to the classification of Correctional Officer II, but approximately a week later the offer was "rescinded solely" because of the no-bypass rule in that an African-American employee was ranked higher than Pope on a certificate of eligibles.  (State Defs. Mem. of Law at 2 (Doc. No. 52).)  In other words, but for the Frazer no-bypass rule, Pope would have been promoted.[2]

Seeking individual redress for the forfeited promotion (see Pl. Resp. at 11), Pope filed the instant lawsuit on February 21, 2003.  Pope brings discrimination claims pursuant to Title VII and the Fourteenth Amendment's Equal Protection Clause, as

---

[2] The court notes that, according to the State Defendants, Pope was promoted to the position of Correctional Officer II on April 17, 2004.  (State Defs. Resp. at 8 n.5 (Doc. No. 52).)

5

enforced by § 1983.  In his complaint, Pope alleges that the State Defendants

discriminated against him because of his race by applying the <u>Frazer</u> no-bypass rule so as

to deny him the promotion in September 2002.  (Compl. at 4 (Doc. No. 1).)  He alleges

that the "continuing application" of the no-bypass rule "is an unconstitutional race

conscious practice" and is "not narrowly tailored to achieve a compelling governmental

interest."  (<u>Id.</u> at 6.)  Furthermore, Pope avers that, "[d]espite the fact that the defendants

have been aware of the changes in governing caselaw for many years, they continue to

adhere to a practice which they know, or should have known, violates the constitutional

rights of non-black employees and job applicants like [Pope]."  (<u>Id.</u>)  As relief, Pope

requests a declaratory judgment, an injunction, back pay with interest, "instatement into

the position [he] would have held if the defendants had not discriminated against [him]

because of race, and compensation for loss of pension and other benefits," as well as

compensatory damages, attorneys' fees and costs.  (<u>Id.</u> at 6-7.)

 The State Defendants are the State of Alabama, ADOC, ASPD, Jackie Graham in

her official capacity as ASPD's director, and Richard F. Allen in his official capacity as

ADOC's commissioner.  (<u>See</u> Doc. Nos. 1, 45.)  The State Defendants filed answers,

admitting some allegations, but denying others, and asserting that they, "at all times, were

acting pursuant to a court injunction imposed on the State of Alabama in <u>U.S. v. Frazer</u>,

317 F. Supp. 1079."  (Answer at 5 (Doc. No. 8)); (<u>accord</u> Answer at 4 (Doc. No. 9).)

 In addition to filing this lawsuit, Pope also participated, <em>via</em> a granted motion to

intervene, in the proceedings in <u>Frazer</u> which led to the retraction of the no-bypass rule.

6

The proceedings in Frazer to terminate the three-decade-old no-bypass rule were initiated in May 2003 by the State Defendants.  Pope joined their pursuit in January 2004.  On May 20, 2005, the court preliminarily enjoined the no-bypass rule.  On June 30, 2006, having found a "'significant change in [factual] circumstances'" and that "termination of the no-bypass rule [was] 'suitably tailored' to these changed circumstances," the Frazer court granted the motions to terminate the no-bypass provision of the injunctive orders.[3] Frazer, 2:68cv2709, Op. at 3 (Doc. No. 779), citing Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367 (1992)).  The final judgment in Frazer pronounces that "[t]he application of the no-bypass rule in this litigation is permanently terminated."  Id. (Final Judgment at 2, Doc. No. 780).

Pope concedes that the Frazer court's termination of the no-bypass rule "provided some of the relief Pope request[s]" in this lawsuit.  (Pl. Resp. at 16 (Doc. No. 56).)  This concession encompasses Pope's claims for injunctive relief asking the court to terminate the no-bypass rule and to enjoin the State Defendants from enforcing it.  (See id. at 17.) As the court reads the complaint, Pope pursues the following claims:  (1) a Title VII claim alleging a discriminatory failure to promote; and (2) a claim alleging that the no-bypass rule as applied to him in 2002 violated his equal protection rights guaranteed by the Fourteenth Amendment to the United States Constitution.

---

[3] The age of this case is attributable to the stay which the parties requested the court to enter pending the outcome of the Frazer court's ruling on Pope's and the State Defendants' challenge to the continued validity of the no-bypass rule.  (See, e.g., Pl. Resp. at 2 (Doc. No. 56)); (Order (Doc. No. 12).)

# V.  DISCUSSION

The issue is whether the State Defendants are entitled to summary judgment on Pope's equal protection and Title VII claims on the ground that the Frazer court-mandated no-bypass rule required the State Defendants to award the promotion at issue to an African-American employee, rather than to Pope.  With that said, no claim is made in this case that the State Defendants violated or otherwise exceeded the scope of the no-bypass rule in denying Pope the promotion in 2002.  To the contrary, it is undisputed that Pope was denied the promotion because of a correct application of the court-ordered no-bypass rule.  Pope, though, says that the State Defendants cannot use the no-bypass rule as a shield to liability.  The State Defendants say otherwise.

The principal authority relied upon by the State Defendants is GTE Sylvania, Inc. v. Consumers Union of United States, Inc., 445 U.S. 375 (1980).  The State Defendants argue that to permit Pope "to hold [them] answerable for failing to defy court-ordered affirmative action whose strictures the State vigorously opposed and, when it lost, obeyed," directly contravenes "GTE Sylvania and the respect for the judicial process that was upheld in that case."  (State Defs. Mem. at  1-2 (Doc. No. 52).)

In GTE Sylvania, the Supreme Court of the United States held that a consumer agency did not violate the Freedom of Information Act ("FOIA") by withholding information from the requesters because a federal district court had enjoined the agency from disclosing the information.  See 445 U.S. at 385-86.  In so holding, the Supreme Court reiterated the "established doctrine that persons subject to an injunctive order

8

issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order." Id. at 386; accord Pasadena City Bd. of Educ. v. Spangler, 427 U.S. 424, 439-40 (1976) ("those who are subject to the commands of an injunctive order must obey those commands, notwithstanding eminently reasonable and proper objections to the order, until it is modified or reversed"); Citizens Concerned About Our Children v. Sch. Bd., 193 F.3d 1285, 1292 (11th Cir. 1999) (citing GTE Sylvania for the proposition that "the law considers an enjoined party to have lost the discretion to contravene a court order"). The Court explained that an enjoined party ought not be put in a position of having "to commit contempt of court" in order to comply with a FOIA request and that to hold that an enjoined entity acts "improperly" in lawfully obeying a valid court order "would do violence to the common understanding of the term 'improperly.'" GTE Sylvania, Inc., 445 U.S. at 387.

The State Defendants contend that two important and relevant principles emerge from GTE Sylvania: first, that "a party is required to comply with a court order out of respect for the judicial process, even if it has proper grounds to object to the order" and, second, that "an agency's compliance with a court order precludes a determination that the agency acted 'improperly' or wrongfully." (State Defs. Mem. at 11 (Doc. No. 52).) To a lesser extent, the State Defendants also rely on an unpublished decision from the Ninth Circuit, which they say "cogently illustrate[s] the principal espoused in GTE

Sylvania."  (State Defs. Mem. at 14, citing <u>Levitoff v. Espy</u>, 74 F.3d 1246 (9th Cir. 1996)

(unpublished table opinion).)

In <u>Levitoff</u>, a male class of U.S. Forest Service employees brought a Title VII

action, seeking monetary and injunctive relief on the basis that a 1981 consent decree

entered in a separate lawsuit to remedy discrimination against female employees

("<u>Bernadi</u> decree") had the effect of discriminating against males.  <u>See</u> 74 F.3d 1246, *1.

In the district court, seeking to avoid "the impossible position of having to disobey a

federal court deliberately," the defendant, who was the Secretary of the Department of

Agriculture, argued that, "because the Forest Service was legally obligated and had no

choice but to comply with the terms of the Decree," the plaintiffs' claims were subject to

dismissal pursuant to the doctrine enunciated by the Supreme Court in <u>GTE Sylvania</u>,

*supra*.  <u>Levitoff v. Espy</u>, No. 92-4108, 1993 WL 557674, *2-*3 (N.D. Cal. Dec. 14,

1993).  Agreeing, the district court dismissed the complaint on the basis of <u>GTE Sylvania</u>.

<u>Id.</u> at *4.  On appeal, the plaintiffs persisted in their argument that <u>GTE Sylvania</u> did not

pose a bar to their claims, but the Ninth Circuit said they were "dead wrong."[4]  74 F.3d

1246, *1.  The Ninth Circuit explained,

> The Secretary's compliance with a court order is a complete defense to
> actions such as these, because the <u>Bernardi</u> court specifically upheld the

---

[4] In the district court, the plaintiffs argued that their collateral attack on the
<u>Bernadi</u> decree entered in an action to which they were not parties was permissible under
<u>Martin v. Wilks</u>, 490 U.S. 755 (1989), discussed *infra*.  <u>See</u> <u>Levitoff</u>, 1993 WL 557674,
*3.  By omitting any discussion of <u>Wilks</u>, the Ninth Circuit implicitly rejected the
plaintiffs' argument.

validity of the decree and ordered the Secretary to comply with its terms upon penalty of contempt.  As the district court correctly held, the Secretary was legally obligated and had no choice but to comply with the terms of the decree.  [The plaintiffs'] complaint fails to allege any facts that fall outside the actions mandated by the <u>Bernardi</u> consent decree.  Thus, the court did not err when it dismissed [the plaintiffs'] claims under the GTE standard.

<u>Id.</u>

Pope, though, says that <u>Levitoff</u> "backhands" <u>Martin v. Wilks</u>, 490 U.S. 755 (1989) (hereafter "<u>Wilks</u>"), and that <u>Wilks</u>, not <u>GTE Sylvania</u>, controls because Pope was not a party to the <u>Frazer</u> proceedings which culminated in the court's injunctive orders and implementation of the no-bypass rule.  (Pl. Resp. at 13 (Doc. No. 56).)  In <u>Wilks</u>, a group of Caucasian firefighters brought suit to enjoin the enforcement of two consent decrees which implemented a city's affirmative action program and resolved African-American employees' employment discrimination lawsuit against a city fire department. 490 U.S. at 758-59.  The Caucasian firefighters alleged that, by adhering to the consent decrees, the city discriminated against them by denying them promotions in favor of less qualified African-American firefighters and that they were entitled to individual relief. <u>Id.</u> at 758.  The <u>Wilks</u> Court rejected the "impermissible collateral attack" rule and allowed the Caucasian firefighters to litigate the merits of their Title VII and equal protection claims attacking the race-conscious promotion decisions made by the city in reliance on the consent decrees, notwithstanding that the Caucasian firefighters were aware of the prior suit which resulted in the consent decrees, but chose not to intervene. <u>See</u> <u>id.</u> at 763; <u>see</u> <u>id.</u> at 765 (explaining that "[t]he linchpin of the 'impermissible

11

collateral attack' doctrine–the attribution of preclusive effect to a failure to intervene–is

. . . quite inconsistent with Rule 19 and Rule 24" of the Federal Rules of Civil

Procedure).  The Court explained that "[a] judgment or decree among parties to a lawsuit

resolves issues as among them, but it does not conclude the rights of strangers to those

proceedings."[5]  Id. at 762.

Pope argues that, under Wilks, because he was not joined as a party in the Frazer

litigation, he is not "bound by the entry of [the] Frazer orders" and that, consequently, the

State Defendants could not rely on the no-bypass rule so as to deny him a promotion

without legal consequences.  (Pl. Resp. at 10 (Doc. No. 56)); (see also id. at 11, 15.)

Pope essentially argues a theory of strict liability, contending that the State Defendants'

application of the no-bypass rule to him automatically subjects them to liability under

Title VII and § 1983.  For the reasons to follow, the court disagrees.

---

[5] Congress overrode Wilks in the context of Title VII employment discrimination suits when it enacted the Civil Rights Act of 1991.  See 42 U.S.C. § 2000e-2(n)(1)(A); Landgraf v. USI Film Prods., 511 U.S. 244, 251 (1994) (observing that Congress enacted § 108 of the Civil Rights Act of 1991, codified at § 2000e-2(n), in response to the Supreme Court's opinion in Wilks, "by prohibiting certain challenges to employment practices implementing consent decrees").  Here, the State Defendants have not relied on that amendment as a ground for summary judgment; thus, as in Levitoff, supra, the court need not address "the thorny issue of retroactivity" of  42 U.S.C. § 2000e-2(n)(1)(A). See 74 F.3d at 1246, *3 n.2; but see Maitland v. Univ. of Minn., 43 F.3d 357, 363 (8th Cir. 1994) (holding that § 108, supra, did not apply retroactively to bar a nonparty's challenge to a consent decree entered before § 108's effective date; "[b]y seeking to apply § 108 to bar [plaintiff's Title VII] cause of action, the [employer] is attempting to attach 'new legal consequences' to [plaintiff's] limited participation in the consent decree proceedings, conduct that was completed well before the effective date of the statute").

Although the defendants in <u>Wilks</u> justified their admittedly race-based employment decisions as mandated by the earlier consent decrees, Pope seizes on the court's reference to a "*judgment* or decree," (Pl. Resp. at 13 (emphasis added)), arguing that, for purposes of <u>Wilks</u>, "there is no substantive difference between a consent decree and a court-entered judgment."   <u>Id.</u>   Assuming without deciding that <u>Wilks</u>' rationale applies equally to litigated judgments, the court nonetheless is unpersuaded that <u>Wilks</u> mandates the conclusion urged by Pope.   In this regard, the court finds instructive the Eighth Circuit's decision in <u>Donaghy v. Omaha</u>, 933 F.2d 1448 (8th Cir. 1991), which is not cited by the parties, but is a case in which the plaintiff made an argument similar to the one which Pope proffers:

> [The plaintiff] . . . apparently would have us read <u>Wilks</u> as nullifying all consent decrees with respect to nonparties.  Under [the plaintiff's] reasoning, if an employer is operating under a constitutionally valid consent decree that requires the employer to make race-conscious employment decisions, the employer still could not make race-conscious employment decisions that would in any way affect nonparties to the consent decree.

<u>Id.</u> at 1457.  The Eighth Circuit rejected the plaintiff's interpretation of <u>Wilks</u>, finding it "flaw[ed]" in that

> it equates the right to challenge a consent decree with a general right to be free of race-conscious employment decisions taken pursuant to a consent decree.  <u>Wilks</u> does not create [the plaintiff's] proposed general right. While <u>Wilks</u> permits a nonparty to challenge the validity of employment decisions made pursuant to a consent decree, it does not speak to whether a particular race-conscious employment decision taken pursuant to a consent decree will meet constitutional standards.  [The plaintiff] seems to argue that all race-conscious remedies are unconstitutional, notwithstanding the Supreme Court's repeated statements that certain narrowly tailored, remedial, race-conscious employment decisions are permitted under the

13

> Constitution.  Nothing in <u>Wilks</u> disturbs these cases, or other substantive law governing reverse discrimination challenges to consent decrees which require race-conscious affirmative action.  <u>Wilks</u> simply holds that those who did not participate and were not represented in prior consent decree litigation may have the opportunity to "ask a court to consider their claims that actions taken pursuant to the consent decree are unlawful under the governing statutory and constitutional standards."

<u>Id.</u> at 1457-58 (internal footnotes omitted).

Here, like the plaintiff in <u>Donaghy</u>, Pope contends that, not only is he not bound by the no-bypass rule, but also that the rule has no bearing on his claims in this lawsuit. The no-bypass rule, according to Pope, must be ignored in these proceedings.  The court, though, finds that Pope's position does not align with the holding in <u>Wilks</u> for the reasons articulated in <u>Donaghy</u>.  If <u>Wilks</u> applies to the type of judgment at issue in this case, which as stated above the court may assume without deciding, <u>Wilks</u> at best permits Pope to challenge the <u>Frazer</u> no-bypass rule uninhibited by the impermissible collateral attack doctrine.  That does not mean, though, that the no-bypass rule is a nullity in either the Title VII or constitutional analysis, as Pope suggests.  Nothing in <u>Wilks</u> alters the well-settled principles of equal protection and Title VII jurisprudence.

The Eleventh Circuit's decision which <u>Wilks</u> affirmed also provides support for the court's finding.  <u>See</u> <u>*In re* Birmingham Reverse Discrimination Employment Litig.</u>, 833 F.2d 1492, 1500-01 (11th Cir. 1987).  There, after holding that the Caucasian firefighters were not bound by the consent decrees and, thus, entitled to consideration on the merits of those claims in the district court, the Eleventh Circuit stated:

14

> Because the defendants concede that the challenged promotions were made
> in a race conscious manner, and because the defendants seek to use the
> consent decrees to justify their actions, we feel compelled to provide the
> district court with some guidance as to the legal significance of a consent
> decree in Title VII litigation when, as in this case, an employer seeks to
> interpose it as a defense against employees who were neither parties nor
> privies to it.

Id. at 1500.  The Eleventh Circuit explained that, in the Title VII context, the defendants'

reliance on the consent decrees was to be analyzed under the standards set out in Johnson

v. Transportation Agency, 480 U.S. 616 (1987).  See id. at 1500-01.

The foregoing discussion brings this case full circle back to the State Defendants'

attack on the merits of Pope's claims.  Again, the State Defendants contend that they

cannot be held liable under § 1983 or Title VII because in 2002 they were required by a

post-trial court injunction to apply the no-bypass rule and it is the application of the no-

bypass rule which caused Pope to lose the promotion, not discriminatory conduct on their

part.  For the reasons set out below, the court finds that no matter which statutory

highway Pope travels in his endeavor to reach intentional discrimination, be it § 1983 or

Title VII, the State Defendants' adherence to the court-ordered no-bypass rule is a

roadblock to recovery on the undisputed facts of this case.


A.  Equal Protection (§ 1983)

In his complaint, Pope brings an equal protection claim challenging the State

Defendants' decision taken pursuant to the no-bypass rule to deny him a promotion.  (See

Compl. at 6 (Doc. No. 1) (alleging that the no-bypass rule as applied to Pope was "not

narrowly tailored to achieve a compelling government interest").)  To survive an equal

protection attack, the State Defendants must show that their application of the no-bypass

rule was narrowly tailored to serve a compelling interest.  See Richmond v. J. A. Croson

Co., 488 U.S. 469, 493 (1989); see also id. at 494 (concluding that "the standard of

review under the Equal Protection Clause is not dependent on the race of those burdened

or benefitted by a particular classification").

The court finds that Citizens Concerned About Our Children v. School Board of

Broward, although not cited by the parties, is controlling.  See 193 F.3d 1285 (11th Cir.

1999).  In that case, the Eleventh Circuit addressed "whether compliance with a consent

decree ever qualifie[s] as a compelling interest for Fourteenth Amendment purposes."[6]

Id. at 1292.  Stating that this question is a "question of law, capable of resolution on

motion for summary judgment," the court answered in the affirmative.  Id.  It explained

that a rule which penalized a governmental entity "for failing to *disobey* the court would

not comport with the sanctity of an unchallenged court order."  Id. (emphasis in original).

The Eleventh Circuit reasoned that "[t]his sanctity expresses itself in many forms, most

strikingly in the collateral order doctrine, which requires a party subject to a court order

to comply with it, pending further review, even if the order arguably violates important

constitutional rights."  Id.  This is the point argued by the State Defendants, and the point

---

[6] For purposes of the compelling interest inquiry, the court cannot envision any reason why compliance with a court injunction should be treated differently than compliance with a consent decree.  In fact, for purposes of his reliance on Wilks, *supra*, Pope insists that there is no distinction between the two.

is well taken.  Indeed, the Eleventh Circuit cites <u>GTE Sylvania</u>, *supra*, upon which the State Defendants rely, stating that, "[i]n other contexts, the law considers an enjoined party to have lost the discretion to contravene a court order."  <u>Id.</u>  "Avoiding contempt and respecting the court that entered the consent decree suffice to make obedience a compelling interest."  <u>Id.</u>  Stated differently, "[w]hen the compelling interest is compliance with a court order, that means that the governmental entity must face a likelihood of contempt under the order if it abandons the racial policy."  <u>Id.</u> at 1293; <u>see also</u> <u>Lomack v. City of Newark</u>, 463 F.3d 303, 310 (3d Cir. 2006) (recognizing that compliance with a consent decree is a compelling interest "if the decree mandates the race-based policy at issue") (citing <u>Citizens Concerned About Our Children</u>, 193 F.3d at 1292-94).

Here, it is undisputed that the court-ordered no-bypass rule mandated the race-based decision at issue.  In 2002, the State Defendants were subject to a court-ordered injunction which required them to adhere to and apply the no-bypass rule when required as they undisputedly did in denying Pope the promotion at issue.  Because the denial of the promotion about which Pope complains occurred at a time when the <u>Frazer</u> no-bypass rule was in full force and effect, its validity unchallenged at that time, had the State Defendants disregarded the rule and promoted Pope, they undisputedly would have "face[d] a likelihood of contempt" from the <u>Frazer</u> court.  <u>Citizens Concerned About Our Children</u>, 193 F.3d at 1293; <u>see also</u> <u>Spallone v. U.S.</u>, 493 U.S. 265, 276 (1990) ("[C]ourts have inherent power to enforce compliance with their lawful orders through

17

civil contempt.").  Accordingly, the court finds that in this case "[a]voiding contempt" and "respecting the court" that entered the no-bypass rule "suffice to make obedience a compelling interest."[7]  Id.

Turning to the narrowly-tailored component of the equal protection analysis, the court finds that the question is whether the State Defendants' application of the no-bypass rule so as to deny Pope the promotion was narrowly tailored to further compliance with the court-mandated no-bypass rule.  The court cannot answer this question in Pope's favor because it is undisputed that compliance with the no-bypass rule required the State Defendants to rescind the promotional offer to Pope and offer the promotion to an

_____

[7] The court notes that "there is a second reason . . . to deem compliance to be a compelling interest."  Citizens Concerned About Our Children, 193 F.3d at 1293.  In Frazer, the late Honorable Frank M. Johnson, Jr., identified the past discrimination and made a specific finding that the evidence demonstrated that the State of Alabama engaged in racial discrimination against African-Americans in filling non-menial jobs and that remedial action was essential.  As a consequence, he implemented the no-bypass rule to remedy "past discriminatory wrongs" against African-Americans which on this record is "a compelling interest by itself."  Id.  No argument has been made that there was not a compelling interest "at the time" the no-bypass rule was entered, which is the relevant time frame for purposes of the compelling interest inquiry.  Id.  "Complying with th[e no-bypass rule] in particular thus reflect[s] another compelling interest beyond respect for court orders."  Id.; see also Newark Branch, NAACP v. Harrison, 940 F.2d 792, 807-08 (3d Cir. 1991) ("Where there is an adequate finding of past discrimination and the remedy is formulated to address this past discrimination, affirmative recruitment efforts mandated by the district court do not violate equal protection guarantees").

African-American employee who ranked higher on a certificate of eligibles.[8]   (See, e.g., Pl. Resp. at 9, stating that "[i]t is undisputed that the decision to rescind Pope's promotion was based on the race-based Frazer rule" (Doc. No. 56).)  To comply with the no-bypass rule, the only choice available to the State Defendants was to deny Pope the promotion.  As the State Defendants point out, the no-bypass rule left them with no discretion, but had they had discretion, they would have promoted Pope.  There simply was no mechanism by which the State Defendants could promote Pope and at the same time fulfill their duty to obey the court-mandated rule.  Had they promoted Pope, the State Defendants would have directly contravened the no-bypass rule.  In other words, they did not have available an alternative remedy which would have allowed them to promote Pope without violating the no-bypass rule.  See generally Hayes v. North State Law Enforcement Officers Ass'n, 10 F.3d 207, 217 (4th Cir. 1993) (defining "narrowly tailored").  Under these facts, the court finds that not only was the decision denying Pope a promotion justified by a compelling interest (i.e., the State Defendants' compliance

---

[8] The court notes that, in Citizens Concerned About Our Children, the Eleventh Circuit did not reach the narrowly tailored prong because the racial busing policy at issue was not explicitly mandated by the consent decree; its implementation had to be "implied."  193 F.3d at 1293.  As there was an absence of evidence making it unclear whether the school board would have been subject to contempt for not complying with the busing policy, summary judgment was inappropriate on the compelling-interest inquiry.  See id. at 1294.  Here, to the contrary, it is undisputed that the State Defendants could have been sanctioned for contempt for violating the no-bypass rule if they had promoted Pope.  (See, e.g., Pls. Resp. at 16 (Doc. No. 56).)

with the court-ordered no-bypass rule), but also that the decision was narrowly tailored to further compliance.

Pope offers three arguments which he says demonstrate a constitutional violation on the part of the State Defendants. For the reasons to follow, the court is not persuaded by these arguments.

First, Pope's argument, as discussed above, that he is not bound by the no-bypass rule does not negate the State Defendants' compelling interest in complying with the rule. (Pl. Resp. at 10-11, 15 (Doc. No. 56).) This principle was made clear in <u>Citizens Concerned About Our Children</u>, where the Eleventh Circuit noted:

> The plaintiffs contend that, even if compliance with the decree were a compelling interest in some cases, it should not justify discrimination against them because they were not parties to the litigation that generated the decree. We can't see the logic here; whether or not these plaintiffs are bound by the decree, the School Board obviously is, and the question is whether the School Board has a compelling interest.

193 F.3d at 1292 n.7.

Second, Pope points to Judge Thompson's Order terminating the no-bypass rule in June 2006, suggesting that the no-bypass rule could not have withstood a constitutional attack in 2002 when it was applied to him. Judge Thompson's Order, though, did not affect the obligation of the State Defendants four years earlier in 2002 to comply with the no-bypass rule. In 2002, there had not been a judicial determination of unconstitutionality which is what counts. To reiterate, an enjoined party must obey an

unconstitutional order until it is adjudged unconstitutional.[9]  GTE Sylvania, 445 U.S. at 386 ("persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, *even if they have proper grounds to object to the order*") (emphasis added); Belk v. Charlotte-Mecklenburg Bd. of Educ., 269 F.3d 305, 399 (4th Cir. 2001) (explaining that under GTE Sylvania "to hold that an entity acts 'improperly' in obeying a valid court order 'would do violence to the common understanding of the term improperly,' even if the order is later held unlawful or unconstitutional")  Similarly, even assuming that the State Defendants believed that they had "proper grounds to object" to the no-bypass rule, GTE Sylvania, 445 U.S. at 386, a reasonable assumption given that they vigorously opposed the employment discrimination lawsuit that led to the issuance of the no-bypass rule, the State Defendants nonetheless were required to obey it until its modification or reversal.  Id.  In short, the court finds that Pope's argument fails to overcome the barricade of GTE Sylvania.

Third, in light of the questionable constitutionality of the no-bypass rule in 2002, Pope blames the State Defendants for "blindly adhering" to the rule, asserting that the State Defendants could have either promoted him or "gone immediately before the district court [in Frazer] and sought relief from the [no-bypass] rule, citing Pope's constitutional

---

[9] The court notes that the GTE Sylvania Court pointed out that its rule is subject to exceptions when the issuing court lacked personal or subject matter jurisdiction or when the injunction, when entered, had only a "frivolous pretense to validity."  445 U.S. at 386. No argument has been made that these exceptions are applicable in this lawsuit and appropriately so.

argument, thus attempting to protect his rights." (Pl. Resp. at 15-16 (Doc. No. 56).)

According to Pope, the State Defendants now must "face the consequences of [their]

failure to seek timely relief from an order [they] knew full well unlawfully impaired

Pope's rights." (Id.) The first option is not an option. The State Defendants could not

lawfully challenge the order by violating it. See GTE Sylvania, 445 U.S. at 386. As to

the second option, while the State Defendants filed a motion to terminate the no-bypass

rule in May 2003 (see Frazer, 2:68cv2709, Op. at 2 (Doc. No. 779)), Pope would have

this court find that their challenge which ultimately was successful comes too late for

purposes of avoiding liability in this lawsuit. Pope essentially seeks to hold the State

Defendants liable for not acting sooner. Notably, though, the court cannot find, and Pope

has not directed the court's attention to, any authority or evidence which supports a

conclusion or an inference that the State Defendants engaged in intentional discrimination

when they did not seek judicial relief from the court-ordered no-bypass rule immediately

when Pope became eligible for the promotion at issue. See generally Washington v.

Davis, 426 U.S. 229, 239 (1976) ("The central purpose of the Equal Protection Clause of

the Fourteenth Amendment is the prevention of official conduct discriminating on the

basis of race."). The court rejects Pope's argument because to accept it is to engage in

impermissible speculation. Moreover, it is noteworthy, as the State Defendants point out,

that if they had not been constrained by the no-bypass rule, they would have promoted

Pope. For the foregoing reasons, the court finds that summary judgment is due to be

entered in favor of the State Defendants on Pope's equal protection claim.

22

B.  Title VII

The court turns to Pope's Title VII failure-to-promote claim, alleging disparate treatment.  Relying on Levitoff, *supra*, in which the Ninth Circuit held that the defendant's "compliance with a court order" was a "complete defense" to Title VII liability pursuant to GTE Sylvania, *supra*, see 74 F.3d 1246, the State Defendants argue that this court can summarily reach the same outcome by applying the GTE Sylvania holding to the facts of this case.  The State Defendants may be correct that, on the facts of this case, GTE Sylvania precludes further analysis, but the court need not decide because it would reach the same result even if it applied the familiar burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), as modified in Johnson v. Transportation Agency, 480 U.S. 616, 626-27 (1987).[10]  See Johnson, 480 U.S. at 626 (holding that Caucasian employee's Title VII claim that his employer discriminated against him through application of an unconstitutional affirmative action plan "fits readily within the analytical framework" of McDonnell Douglas, *supra*); see In re Birmingham, 833 F.2d at 1499 (directing district court to evaluate employer's defense that adverse action was required by consent decree based upon the principles announced in Johnson, *supra*).

---

[10] For a comparison between the strict scrutiny test, applied above, and Johnson's Title VII test, see Krupa v. New Castle County, 732 F. Supp. 497, 507-08 & n.35 (D. Del. 1990).

Briefly, to explain, there is no dispute that race was "taken into account" in the decision to deny Pope the promotion, which is all the proof needed for Pope to establish a prima facie case. Johnson, 480 U.S. at 626. Instead, moving for summary judgment, the State Defendants focus on their intermediary burden by relying on the no-bypass rule as providing the nondiscriminatory reason for their decision to deny Pope the promotion at issue. The court agrees with the State Defendants that compliance with a court order is a legitimate and nondiscriminatory reason for taking an adverse employment action. Cf. id. (reliance on affirmative action plan provides nondiscriminatory rationale for employer's decision to deny employee a job benefit); Jackson v. Seaboard Coast Line R.R., 678 F.2d 992, 1018 (11th Cir. 1982) (articulating as nondiscriminatory reason for the adverse employment action that the promotion procedure was dictated by the union contract). Indeed, the fact that the State Defendants denied him the promotion solely to comply with the Frazer no-bypass rule is not in contention. (See, e.g., Pl. Resp. at 9, stating that "[i]t is undisputed that the decision to rescind Pope's promotion was based on the race-based Frazer rule and Pope's race" (Doc. No. 56).) Because the no-bypass rule is the basis for the State Defendants' decision, "the burden shifts to [Pope] to prove that the employer's justification is pretextual and the [rule] is invalid." Johnson, 480 U.S. at 626.

Johnson was a discrimination suit brought by a Caucasian male who alleged that the promotion of an allegedly less qualified female pursuant to a voluntary affirmative action plan violated his rights under Title VII. The Johnson court set forth a two-part test for evaluating whether an affirmative action plan is valid. First, the court must decide

whether consideration of race "was justified by the existence of a 'manifest imbalance' that reflected underrepresentation of [minorities] in 'traditionally segregated job categories.'"  Id. at 631 (quoting United Steelworkers v. Weber, 443 U.S. 193, 197 (1979)); see id. at 632 n.10 (explaining that the proof needed to show a manifest imbalance may be shown without the more rigorous proof necessary to establish a prima facie case of discrimination against the employer).  Second, the affirmative action plan must not "unnecessarily trammel[] the rights of [nonminority] employees or create[] an absolute bar to their advancement."  Id. at 637-38.

There, though, is a notable distinction between this case and Johnson. Unlike in Johnson, the court is not confronted with an affirmative action plan voluntarily implemented by the employer.  The state did not choose to resolve this case through a negotiated agreement; it vigorously contested liability, surrendering only when the Frazer court found against it.  See Frazer, 2:68cv2709, Op. at 3 (Doc. No. 779) (observing that the Frazer court implemented the no-bypass rule after a trial on the merits based upon a judicial determination that "'up until 1970, the State of Alabama unabashedly refus[ed] to hire and promote African-Americans to almost any and all non-menial positions in state government because of their race'") (citation omitted).  The fact that the relief in this case, more specifically the no-bypass rule, was created and mandated by an Article III judge after a trial on the merits distinguishes this case factually from Johnson.

The issue is what legal effect, if any, does a judicial determination of liability have on the Johnson inquiries.  See, e.g., In re Birmingham, 833 F.3d at 1501 n.22 (suggesting

25

a distinction between a judicial determination and an affirmative action plan when it
"emphasized that there has been no judicial determination that the City is liable for past
discrimination").  In Cohen v. Brown University, the First Circuit observed that, for
purposes of an equal protection challenge, a federal district court's remedy "does not
raise the concerns underlying the Supreme Court's requirement of a particularized factual
predicate to justify voluntary affirmative action plans."  101 F.3d 155, 171 (1st Cir.
1996).  It continued,

> Here, gender-conscious relief was ordered by an Article III court,
> constitutionally compelled to have before it litigants with standing to raise
> the cause of action alleged; for the purpose of providing relief upon a duly
> adjudicated determination that specific defendants had discriminated
> against a certified class of women in violation of a federal
> anti-discrimination statute; based upon findings of fact that were subject to
> the Federal Rules of Evidence.  The factual problem presented in
> affirmative action cases is, "Does the evidence support a finding of
> discrimination such that race- or gender-conscious remedial measures are
> appropriate?"  We find these multiple indicia of reliability and specificity to
> be sufficient to answer that question in the affirmative.

Id. at 172-73.

Here, as in Cohen, there was a judicial finding of intentional discrimination after a
trial on the merits.  The Frazer court set out its findings after a detailed evidentiary
discussion of the underrepresentation of African-Americans in non-menial state jobs and

26

the discriminatory practices which led to the disparity.[11]  See Frazer, 317 F. Supp.

at 1085-90.  The court concluded that the ADOC, among other state defendants, had

"engaged in a pattern and practice of racial discrimination in employment" and that

"progress toward erasing the effects of prior exclusionary practices upon the basis of race

ha[d] been minimal and in many instances non-existent."  Frazer, 1976 WL 729, *6.

Applying Cohen's rationale, the court finds that the prior determination of past

discrimination by the Frazer court satisfies the Johnson inquiry that the remedial action

be supported by a manifest imbalance.  Stated differently, on the facts of this case, the

court finds that the Frazer court's judicial determination of liability dispenses with the

need for further evidentiary analysis as to the first Johnson inquiry.

The foregoing finding leads to consideration of whether the no-bypass rule

"unnecessarily trammeled the rights of [nonminority] employees or created an absolute

bar to their advancement."  Johnson, 480 U.S. at 637-38.  The short answer is "No."  The

---

[11] To elaborate, in Frazer, the court ruled that the ADOC and other state agencies discriminated against African-Americans in their hiring and promotional decisions regarding non-menial employment positions.  The Frazer court recognized that the prevalent racial discrimination within the various state agencies with regard to employment practices required the issuance of injunctive orders to remedy the discrimination, including implementation of the no-bypass rule.  See, e.g., Frazer, 317 F. Supp. at 1090 (finding "it necessary to enter a detailed and specific decree which will not only prohibit discrimination but which will also prescribe procedures designed to prevent discrimination in the future and to correct the effects of past discrimination").  The purpose of the no-bypass rule, thus, was "designed to break down old patterns of racial segregation and hierarchy" and was "structured to 'open employment opportunities for [African-Americans] in occupations which ha[d] been traditionally closed to them.'" Weber, 443 U.S. at 208.

no-bypass rule did not require the discharge or demotion of Caucasian workers and their replacement with African-American employees.  Qualifications and fitness for the job were considerations in the selection process.  See Frazer, 317 F. Supp. at 1091 (application of the no-bypass rule was not required if "the defendants determine[d] that the [African-American] applicant [was] not qualified to perform the duties of the position, or [was] otherwise not fit for the position.").  Moreover, the court did not impose mandatory hiring quotas.  See Frazer, 1976 W.L. 729, *6.  Nor did the no-bypass rule create an absolute bar to the advancement of Caucasian employees; for example, there was no requirement that the state bypass higher-ranked Caucasian applicants in favor of lower-ranked African-American applicants on a certificate of eligibles.  See Frazer, 317 F. Supp. at 1091.

Based on the foregoing, the court finds that, to the extent that the Johnson inquires are relevant in this case, they are satisfied.  Furthermore, the court finds that Pope's arguments which the court rejected in the preceding subsection likewise are insufficient to establish an issue of material fact on pretext.  Accordingly, the court finds that the State Defendants are entitled to summary judgment on Pope's Title VII claim.

## VI.  ORDER

Accordingly, it is CONSIDERED and ORDERED that the State Defendants' motion for summary judgment (Doc. No. 51) be and the same is hereby GRANTED.

A judgment in accordance with this Memorandum Opinion and Order shall be entered separately.

DONE this 24th day of July, 2008.

/s/ Ira DeMent
SENIOR UNITED STATES DISTRICT JUDGE